UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

MARY LYNN McCALL,

                      Plaintiff,

        v.

CAROLYN W. COLVIN,
COMMISSIONER OF SOCIAL SECURITY,

                    Defendant.
_____

<u>DECISION & ORDER</u>

15-CV-6383P

## <u>**PRELIMINARY STATEMENT**</u>

Plaintiff Mary Lynn McCall ("McCall") brings this action pursuant to Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), seeking judicial review of a final decision of the Commissioner of Social Security (the "Commissioner") denying her application for Supplemental Security Income Benefits ("SSI").  Pursuant to 28 U.S.C. § 636(c), the parties have consented to the disposition of this case by a United States magistrate judge.  (Docket # 7).

Currently before the Court are the parties' motions for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure.  (Docket ## 12, 14).  For the reasons set forth below, I hereby vacate the decision of the Commissioner and remand this claim for further administrative proceedings consistent with this decision.

## BACKGROUND

### I.   Procedural Background

McCall protectively filed for SSI on April 5, 2012, alleging disability beginning on April 1, 2012, as a result of chronic low back pain, depression, anger, mood/personality disorder, acid reflux, shortness of breath, and inflammatory bowel disease.  (Tr. 191, 194).[1]  On June 11, 2012, the Social Security Administration ("SSA") denied McCall's claim for benefits, finding that she was not disabled.[2]  (Tr. 87).  McCall requested and was granted a hearing before Administrative Law Judge John P. Costello (the "ALJ").  (Tr. 107-09, 127-31).  The ALJ conducted a hearing on February 25, 2014.  (Tr. 34-86).  In a decision dated March 27, 2014, the ALJ found that McCall was not disabled and was not entitled to benefits.  (Tr. 16-33).

On May 1, 2015, the Appeals Council denied McCall's request for review of the ALJ's decision.  (Tr. 1-6).  McCall commenced this action on June 24, 2015, seeking review of the Commissioner's decision.  (Docket # 1).

### II.   Relevant Medical Evidence[3]

#### A.   Evelyn Brandon Health Center Mental Health Clinic

The record contains McCall's treatment records from the Evelyn Brandon Health Center Mental Health Clinic ("EBMHC") beginning on April 3, 2011.  (Tr. 243-45).  On that date, Susan Bush ("Bush"), LCSW, conducted an annual mental health assessment of McCall.  (*Id.*).  The treatment notes indicate that McCall had been diagnosed with intermittent explosive

---

[1]   The administrative transcript shall be referred to as "Tr. __."

[2]   McCall's previous claim for benefits was denied on June 20, 2008.  (Tr. 179).

[3]   Those portions of the treatment records that are relevant to this decision are recounted herein.  McCall does not challenge the ALJ's physical RFC determination.  Accordingly, records relating to her physical impairments are only discussed to the extent they contain information pertinent to her mental impairments.

disorder, anxiety disorder, not otherwise specified, attention-deficit hyperactivity disorder

("ADHD"), mood disorder, not otherwise specified, and personality disorder, not otherwise

specified. (*Id.*). According to the records, McCall was taking Celexa, which was effectively

treating her depression, temper, and anxiety, although she had manifested "recent slippage"

during a phone call, which had led to a reprimand at work. (*Id.*). McCall was working

approximately ten hours a week for the Work Experience Program ("WEP") related to her

receipt of public assistance benefits. (*Id.*). McCall also took Atarax as needed for dysphoria.

(*Id.*).

According to the progress notes, McCall's symptoms had been stable during the

previous review period with the exception of two instances of aggression. (*Id.*). She reported

improved confidence in her parenting abilities and some reduction in power struggles with her

children. (*Id.*). McCall reported that her mood and functioning had improved sufficiently to

permit her to return to the WEP placement. (*Id.*).

On November 22, 2011, McCall met with Isis W. Bottros ("Bottros"), MD, for a

medication management appointment. (Tr. 259-61). The treatment notes indicate that McCall

was twenty-six years old, unemployed, and had three children. (*Id.*). Bottros noted that

McCall's mood and behavior were "fairly stable" on Celexa and McCall reported increased

depression and anxiety without it. (*Id.*). Although she was better on medication, McCall

reported continued, but less frequent, periods of feeling down and unmotivated. (*Id.*). She

continued to cope well at home with her three children, aged eight, seven and two. (*Id.*). Her

seven-year-old son had been diagnosed with ADHD and was taking Concerta; her youngest son

was enrolled in a Head Start program. (*Id.*).

On March 5, 2012, McCall met with Chaya Guha Bhuvaneswaran ("Bhuvaneswaran"), MD, for a medication management appointment.  (Tr. 252-58). Bhuvaneswaran noted that McCall presented as stable, although she continued to be symptomatic.  (*Id.*).  McCall reported frequent depression, isolation, low motivation, social withdrawal, decreased appetite, and poor sleep quality.  (*Id.*).  Despite the ongoing symptoms, Celexa was reportedly improving McCall's ability to manage her household and childcare responsibilities.  (*Id.*).  According to McCall, she was able to get up on time and assist her children to get ready for school.  (*Id.*).  She had also managed to maintain weekly appointments for her three-year-old, who was receiving home preparation from a Head Start teacher.  (*Id.*). McCall reported minimal enjoyment of and involvement with her children, but was able to recognize safety issues, did not leave them home alone, and was able to maintain a structured routine in which she was available to them.  (*Id.*).

McCall also reported periods of irritability, characterized by cursing, loss of patience, and throwing furniture.  (*Id.*).  She did not have a history of physically abusing her children and was encouraged to report any such incidents.  (*Id.*).  At the time of the appointment, McCall was unemployed and had lost her previous employment due to temper issues.  (*Id.*). Bhuvaneswaran noted that McCall presented as sarcastic and hostile with an anxious mood and affect.  (*Id.*).  Bhuvaneswaran prescribed Remeron to address McCall's ongoing depression. (*Id.*).

On April 10, 2012, McCall met with Prakash P. Reddy ("Reddy"), MD, for a medication management appointment.  (Tr. 370-74).  Reddy noted that McCall's case had been transferred to him, and he reviewed her file.  (*Id.*).  He indicated that she suffered from a mood disorder, most likely major depressive disorder that was mild to moderate, generalized anxiety

disorder, characterized by skin picking and nail biting, and a history of intermittent explosive disorder or bipolar II disorder, which accounted for her depressive and rage episodes. (*Id.*). His treatment notes indicate that McCall was arrested in 2007 for a severe violent incident involving an assault with a weapon that occurred in her home. (Tr. 373-74). The notes further suggest that McCall was involved in another severe incident in September 2011 involving an assault without a weapon that occurred in the community. (*Id.*). Given the recency of this episode, along with McCall's ongoing interpersonal frustrations and hopelessness, Reddy assessed that McCall was moderately at risk of engaging in violent conduct. (*Id.*).

Reddy assessed a Global Assessment of Functioning ("GAF") of 50. (*Id.*). Reddy opined that McCall presented as stable, although she continued to be symptomatic and demonstrated a depressed mood, poor concentration, memory impairment, and paranoid ideation. (*Id.*). He noted that her main problem appeared to be episodic anger and that she reportedly had punched a wall in anger the previous day. (*Id.*). Reddy discontinued Remeron due to sedative effects. (*Id.*). He prescribed Risperdal two times per day for anger management. (*Id.*). He also discussed emergency resources and advised her to call the clinic, if needed, prior to her next appointment. (*Id.*).

McCall returned for an appointment with Reddy on May 10, 2012. (Tr. 366-69). McCall presented as stable, although she continued to experience symptoms, and she demonstrated an anxious, depressed mood, poor concentration, and impaired memory for recent events. (*Id.*). McCall reported ongoing back pain that was not alleviated by medication and was aggravating her depression. (*Id.*). She also reported that the Risperdal was helpful in addressing her anger problems. (*Id.*).

On July 2, 2012, Bush reviewed McCall's treatment plan. (Tr. 397-99). She noted that McCall's goals were to stabilize her mood and improve her functioning and that she should attempt to get out more, engage in activities with her children, and maintain appropriate anger responses. (*Id.*). Bush indicated that McCall had attended two therapy sessions and two medication sessions during the previous three months. (*Id.*). She also noted that McCall had missed two therapy sessions due to severe back pain and hospitalization. (*Id.*).

McCall attended an appointment with Reddy on July 10, 2012. (Tr. 362-65). According to Reddy, McCall presented with depressed mood, poor concentration, and memory impairments. (*Id.*). She reported improvement in her anger problems, but continued depression despite taking Celexa. (*Id.*). McCall attributed her depression to ongoing pain issues and her son's health problems. (*Id.*). McCall reported that her primary care doctor had prescribed Cymbalta to address her pain, but that it had caused increased depression and crying episodes. (*Id.*).

Bush reviewed McCall's treatment plan again on October 8, 2012. (Tr. 394-96). Since the last review, McCall had attended a medication session and three therapy sessions. (*Id.*). She continued to take Celexa and Risperdal and reported positive responses and decreased anger. (*Id.*). McCall nonetheless continued to feel depressed and attributed her feelings to psychosocial stressors in her life. (*Id.*).

On October 17, 2012, McCall attended another appointment with Reddy. (Tr. 358-61). McCall's three children also attended the appointment and were disruptive, making it difficult for Reddy to evaluate McCall. (*Id.*). Again, McCall presented as anxious and depressed with poor concentration and impaired memory. (*Id.*). She indicated that she continued to experience stress caring for her children and was having difficulty focusing and

6

concentrating.  (*Id.*).  She reported continued use of Celexa and Risperdal and that Bush had

recommended medication to address her ADHD.  (*Id.*).  Reddy recommended Ritalin after

McCall denied any history of hypertension or heart problems.  (*Id.*).

McCall returned for another appointment with Reddy on November 12, 2012.

(Tr. 354-57).  During the appointment, McCall reported that she had not begun taking Ritalin

because the warning label indicated that it should not be taken if she experienced chest pains.

(*Id.*).  Reddy advised her to consult with her primary care physician to determine the cause of her

chest pain.  (*Id.*).  McCall reported that she did little at home and did not want to work due to her

difficulties interacting with others.  (*Id.*).  She indicated that she was applying for SSI.  (*Id.*).

Bush conducted another treatment plan review on December 19, 2012.

(Tr. 391-93).  Bush indicated that McCall had been attending her medication and therapy

sessions and had been prescribed Ritalin, but would consult with her primary care physician

before taking it.  (*Id.*).

On January 17, 2013, McCall attended another appointment with Reddy.

(Tr. 350-53).  McCall reported increased stress resulting from her ten-year-old daughter's

behavioral problems.  (*Id.*).  McCall continued to take Celexa, but had not started Ritalin because

she continued to experience chest, neck, and back pain.  (*Id.*).  Reddy suggested Wellbutrin, but

McCall reported that she had attempted Wellbutrin in the past but experienced side effects.  (*Id.*).

On April 16, 2013, Bush completed another review of McCall's treatment plan.

(Tr. 388-90).  Bush noted that McCall's depression and anger were largely managed by her

prescription medications, although she continued to experience breakthrough symptoms.  (*Id.*).

According to Bush, McCall was working through therapy to reduce and improve her

management of psychosocial stressors, primarily stressors from her parenting responsibilities. (*Id.*).

McCall attended another appointment with Reddy on April 29, 2013. (Tr. 346-49). Reddy noted that McCall presented with a depressed affect, a "so so" mood, paranoid ideation, poor concentration, and impaired memory for recent events. (*Id.*). McCall reported increased stress due to her daughter's behavioral problems and lack of interest in attending school. (*Id.*). On June 22, 2013, Bush reviewed McCall's treatment plan, and her report was primarily unchanged from the last report. (Tr. 385-87).

On September 5, 2013, McCall attended another appointment with Reddy and presented as depressed and irritable with poor concentration and impaired memory for recent events. (Tr. 341-45). McCall indicated that she was not doing well and was experiencing many social problems that were affecting her mood. (*Id.*). Bush reviewed McCall's treatment plan again on September 22, 2013, without noting any significant changes. (Tr. 382-84). Bush reviewed McCall's treatment plan on December 14, 2013, and did not report any changes. (Tr. 379-81).

McCall met with Reddy on February 6, 2014. (Tr. 375-78). McCall reported increased anger, ongoing irritability, difficulties with her neighbors, and family difficulties. (*Id.*). McCall indicated that her children did not listen to her. (*Id.*). She denied any adverse effects from her medication. (*Id.*).

**B.**    **Unity Family Medicine at Country Village**

Treatment records demonstrate that McCall received primary care from Margaret Baxter ("Baxter"), MD, at Unity Family Medicine at Country Village. (Tr. 262-320, 402-73). On May 12, 2011, McCall met with Baxter for a physical examination. (Tr. 286-90). During the

appointment, McCall complained of fatigue, back pain, bipolar disorder, and reflux.  (*Id.*).  With respect to her mental health, Baxter noted that her bipolar disorder was stable and that she continued to receive psychiatric treatment, including medication management and therapy.  (*Id.*).

On April 16, 2012, McCall attended an appointment with Suzanne Albright ("Albright"), NP, and requested completion of forms for the Department of Social Services ("DSS").  (Tr. 272-74, 454-56).  McCall reported that she was disabled due to her back pain and mental health issues.  (*Id.*).  Albright noted that McCall was raising three children, continued to receive pain management, and had an upcoming appointment with Dr. Maxwell.  (*Id.*).  Albright assessed that McCall's lower back pain was under sub-optimal control.  (*Id.*).  She consulted with Baxter, who agreed that McCall was not "totally disabled," but that such an evaluation should be put on hold pending the results of McCall's consultation with Dr. Maxwell.  (*Id.*).

C.    **Medical Opinion Evidence**

1.    **Bush and Reddy**

On April 18, 2012, Bush completed an employability assessment relating to McCall.  (Tr. 336-40).  On the form, Bush indicated that she had been treating McCall approximately once or twice monthly since May 2006 and had evaluated McCall approximately fourteen times during the previous year.  (*Id.*).  She noted that McCall complained of irritability, depression, anger, and outbursts.  (*Id.*).  In response to the preprinted question "Has [i]ndividual's condition improved as a result of this treatment," Bush checked both the "yes" and the "no" boxes and explained, "Some overall improvement, brief periods of greater improvement but overall remains impaired."  (*Id.*).

According to Bush, McCall had been diagnosed with mood disorder, not otherwise specified, intermittent explosive disorder, ADHD, anxiety disorder, not otherwise

specified, and personality disorder, not otherwise specified. (*Id.*). Bush assessed a GAF of 50. (*Id.*). Using a checkbox chart, Bush indicated that McCall "on occasion": had been hospitalized; interacted appropriately with others; engaged in repetitive violent actions towards herself or others; and engaged in behavior that interfered with her activities of daily living. (*Id.*). She also noted that McCall frequently lost her job or failed to complete programs. (*Id.*).

Using another checkbox chart, Bush opined that McCall was "very limited"[4] in her ability to perform simple and complex tasks independently and maintain attention and concentration for role tasks. (*Id.*). She also opined that McCall was "moderately limited"[5] in her ability to follow, understand and remember simple instructions and directions, and regularly attend to a routine and maintain a schedule. (*Id.*). According to Bush, McCall did not have any limitations in her ability to maintain basic standards of hygiene and grooming and perform low stress and simple tasks. (*Id.*). Bush also indicated that McCall was able to use public transportation. (*Id.*). Bush opined that McCall appeared to be permanently disabled and was not expected to improve. (*Id.*). Bush added the following explanation, "Functioning had been impaired for substantially more than 12 months. Not able to maintain substantial, gainful employment for 3+ years." (*Id.*). On March 8, 2013, Reddy reviewed Bush's opinion and adopted it in its entirety. (*Id.*).

On January 7, 2014, Bush completed another employability assessment related to McCall. (Tr. 203-06). Again, she indicated that McCall had been diagnosed with mood disorder, not otherwise specified, intermittent explosive disorder, ADHD, anxiety disorder, and personality disorder, not otherwise specified. (*Id.*). She assessed a GAF of 55 and noted that parenting responsibilities, relationships, and physical pain were stressors. (*Id.*). The checkbox

---

[4] "Very limited" was defined as the inability to function twenty-five percent or more of the time. (*Id.*).

[5] "Moderately limited" was defined as the inability to function ten to twenty-five percent of the time. (*Id.*).

charts were completed in the same manner as on the March 8, 2013 opinion except that Bush

downgraded McCall's capacity to perform low stress and simple tasks to "moderately limited."

(*Id.*).  Bush opined that McCall had improved with treatment, but explained, "Overall

improvement but still remains impaired."  She again noted that McCall was "unable to maintain

substantial, gainful employment for 5+ years" and opined that she was permanently disabled.

(*Id.*).

>   ### 2.  <u>Yu-Ying Lin, PhD</u>

On June 5, 2012, state examiner Yu-Ying Lin ("Lin"), PhD, conducted a

consultative psychiatric evaluation of McCall.  (Tr. 331-35).  McCall reported that she was

twenty-six and had driven herself to the examination.  (*Id.*).  McCall reported that she had

attended high school in a normal class setting and had obtained her GED.  (*Id.*).  She was

unemployed, and her last job was as a floor person in a party warehouse, where she worked for

approximately three weeks.  (*Id.*).  She reportedly left that employment because it was a

temporary position.  (*Id.*).  Her longest employment was for a period of approximately two

months.  (*Id.*).  According to McCall, she had difficulty maintaining employment due to

interpersonal difficulties, depression, and anger problems.  (*Id.*).  She resided with her three

children, aged nine, eight and three.  (*Id.*).

According to McCall, she had been receiving ongoing outpatient mental health

medication and therapy for approximately twelve years and had been hospitalized after a mental

health arrest due to an emotional breakdown in 2002.  (*Id.*).  McCall reported recent weight loss

and trouble sleeping.  (*Id.*).  She indicated that she had suffered depressive symptoms since she

was fourteen, which had worsened as her physical health declined.  (*Id.*).  According to McCall,

her depression was characterized by dysphoric moods, psychomotor retardation, hopelessness,

loss of usual interest, irritability, fatigue, diminished self-esteem, diminished sense of pleasure, and social withdrawal. (*Id.*). She also reported recurrent thoughts of death, without plan or intent. (*Id.*).

McCall indicated that she also suffered from occasional anxiety-related symptoms, including excessive worry, irritability, restlessness, and difficulty concentrating. (*Id.*). She endorsed long-standing anger issues characterized by outbursts, destructive behaviors, and incarcerations due to her failure to control her anger. (*Id.*). According to McCall, she had been arrested in 2006 for third-degree assault and was sentenced to thirty days and one year of mental health court. (*Id.*).

McCall reported that she was able to care for her own personal hygiene, cook, clean, wash laundry, and grocery shop, although she needed assistance with many of these tasks due to her ongoing medical conditions. (*Id.*). According to McCall, her children or their father provided assistance when she needed it. (*Id.*). She was able to drive, but had difficulty taking public transportation due to medical conditions and anxiety. (*Id.*). She reported that she was able to manage her own money, but was behind on her bills. (*Id.*).

Upon examination, Lin noted that McCall appeared casually dressed and well-groomed. (*Id.*). According to Lin, McCall was cooperative, but slightly irritable and had a poor manner of relating. (*Id.*). Lin opined that McCall had fluent speech with clear voice and adequate language, coherent and goal-directed thought processes, dysphoric affect and neutral mood, clear sensorium, full orientation, fair insight, fair judgment, and below average intellectual functioning. (*Id.*). Lin noted that McCall's attention and concentration were intact, but her memory was moderately impaired due to anxiety and depression. (*Id.*). According to Lin, McCall was able to complete the serial threes and could recall three out of three objects

immediately, two out of three objects after delay, and could complete five digits forward and

three digits backward.  (*Id.*).

        According to Lin, McCall could follow and understand simple directions and

instructions, perform simple tasks independently, maintain attention and concentration, maintain

a regular schedule, learn new tasks, perform complex tasks independently, and make appropriate

decisions.  (*Id.*).  According to Lin, McCall was unable to relate adequately with others and

could not appropriately deal with stress.  (*Id.*).  Lin indicated that McCall's difficulties were

caused by lack of motivation and stress-related problems.  (*Id.*).  According to Lin, the

examination suggested that McCall might suffer from psychiatric problems, but the problems

were not significant enough to interfere with her ability to function on a regular basis.  (*Id.*).  Lin

assessed that McCall suffered from major depressive disorder, moderate, and intermittent

explosive disorder.  (*Id.*).

        **3.**      **E. Kamin, Psychology**

        On June 8, 2012, agency medical consultant Dr. E. Kamin ("Kamin") completed a

Psychiatric Review Technique.  (Tr. 92-93).  Kamin concluded that McCall's mental

impairments did not meet or equal a listed impairment.  (*Id.*).  According to Kamin, McCall

suffered from mild limitations in her activities of daily living and ability to maintain

concentration, persistence and pace, and moderate limitations in her ability to maintain social

functioning.  (*Id.*).  Kamin completed a mental Residual Functional Capacity ("RFC")

assessment.  (Tr. 95-97).  Kamin opined that McCall suffered from moderate limitations in her

ability to understand, remember and carry out detailed instructions, work in coordination with or

in proximity to others without being distracted by them, accept instructions and respond

appropriately to criticism from supervisors, get along with coworkers or peers without distracting

them or exhibiting behavioral extremes, and travel in unfamiliar places or use public transportation. (*Id.*). According to Kamin, although McCall suffered from a medically determinable impairment, it was "not to the degree alleged." (*Id.*). Kamin opined that McCall suffered from mild to moderate limitations that would not preclude her from working. (*Id.*).

## III.    <u>Non-Medical Evidence</u>

### A.    <u>Application for Benefits</u>

McCall reported that she was born in 1985 and had previously been employed on the floor of a retail store and as a food server and cashier. (Tr. 178, 195). According to her application, McCall lived in a house with her three children and was able to care for her children with assistance from her son's father, who helped with cooking, cleaning, and laundry. (Tr. 183-90). McCall indicated that she was generally able to care for her personal hygiene without assistance, although she needed reminders to take her medicine, and sometimes stayed in her pajamas and did not prepare meals due to depression and stress. (*Id.*). McCall reported that she could prepare simple meals a few times each week, depending upon her back pain, and that her son's father and her mother also assisted with meal preparation. (*Id.*). She reported that she was able to complete indoor chores such as cleaning and laundry, but was unable to complete outdoor chores. (*Id.*). Sometimes her older children assisted with indoor chores if McCall was having difficulty completing them. (*Id.*).

McCall was generally able to leave her house, but sometimes stayed in due to depression and pain. (*Id.*). She was able to drive and to go out alone. (*Id.*). She went grocery shopping once a week for approximately forty-five minutes, although she had difficulty

concentrating, especially when the store was busy.  (*Id.*).  She was able to pay bills, although they were frequently late because she would forget to pay them.  (*Id.*).

McCall read approximately once a week and sat outside her house to watch her children play approximately three times each week.  (*Id.*).  She reported that she had difficulty maintaining sleep and had problems getting along with her family.  (*Id.*).  According to McCall, she also had difficulty lifting, standing, walking, sitting, climbing stairs, and reaching.  (*Id.*).  She reported difficulty paying attention and completing tasks.  (*Id.*).  McCall stated that she was able to follow written instructions, but was unable to follow spoken instructions.  (*Id.*).  She indicated that she had problems getting along with supervisors or persons in positions of authority due to her problems with anger.  (*Id.*).  According to McCall, she had limited employment experience and had "got[ten] in trouble for problems" when she was employed.  (*Id.*).

**B.**     **<u>Administrative Hearing Testimony</u>**

During the administrative hearing, McCall testified that she was twenty-eight and was not currently working.  (Tr. 45).  According to McCall, she had never been employed on a full-time basis and supported herself through DSS and Section 8 benefits.  (*Id.*).  McCall testified that she had previously been hired on a temporary basis at a Halloween store managed by her sister.  (Tr. 45-46).  She also had previously worked for approximately three months at a fast food restaurant.  (Tr. 47-48).  She was fired from that position after taking time off to go out of town.  (*Id.*).  According to McCall, she had tried working "several times" for "probably no longer than a month at a time" through WEP.  (Tr. 76).  She testified that she was "taken out" of work "because it was too overwhelming."  (*Id.*).  She explained that she performed office work, including answering phones and filing, but found that the work, even on a ten-hour per week

schedule, divided into approximately three-hour shifts, was "too much for me."  (Tr. 77).

McCall stated that she had obtained her GED and lived with her three children.  (Tr. 45, 49).

 McCall testified that she was unable to work due primarily to her mental health

issues, although she also had some physical problems.  (Tr. 49-50).  McCall's principal issues

were depression and anger.  (*Id.*).  She indicated that she had been taking medication and

attending therapy for approximately nine years; she typically consulted a psychiatrist quarterly

and her therapist monthly.  (Tr. 50-51, 57).  McCall stated that she had had several verbal

disagreements with her psychiatrist and the staff at the clinic relating to scheduling issues.

(Tr. 51-54).  According to McCall, her medication helped alleviate her symptoms, but she still

continued to experience stress.  (Tr. 54).  McCall testified that her therapy sessions were helpful

and permitted her to "talk to let everything out," which made her feel somewhat better.  (Tr. 57).

Bush, McCall's therapist, sometimes provided techniques for managing emotions, including

moving to a quiet area, getting a babysitter, or having time to herself.  (*Id.*).

 McCall testified that she previously had been convicted of assault and violating an

order of protection and was required to attend mental health court and anger management classes

as a result.  (Tr. 60).  McCall stated that she had difficulty sleeping during the night and typically

slept for "at least" six hours a night and sometimes napped during the day while her children

were at school.  (Tr. 61).  She reported that she got anxious and was easily overwhelmed,

particularly preparing for family events or going grocery shopping.  (Tr. 62-63).  Occasionally,

she experienced rapid heartbeats and felt like she could not breathe.  (*Id.*).

 McCall testified that she also suffered from ADHD, which caused difficulty

concentrating and focusing.  (Tr. 64).  According to McCall, her psychiatrist had prescribed

Ritalin, but she did not want to take it without consulting her primary care doctor, which she had

not yet done.  (Tr. 65).  McCall stated that she also suffered from lower back pain, which she treated with physical therapy, a TENS unit, and injections.  (Tr. 66-68).  She reported difficulty lifting, carrying, sitting, and standing.  (Tr. 68-69).  According to McCall, she recently began experiencing pain in her hip and her feet.  (Tr. 73-75).

She testified that she typically woke up at approximately 6:30 a.m. and helped her youngest child dress.  (Tr. 71).  She sometimes helped her children get breakfast.  (*Id.*).  McCall frequently attended appointments when her children were at school or went shopping.  (Tr. 72). McCall did not prepare lunch for her children, but typically prepared dinner.  (*Id.*).  According to McCall, her son's father assisted with childcare approximately three times a week and McCall also visited her mother once or twice a week, which provided her a break.  (Tr. 78-79).  McCall's daughter sometimes helped her care for her youngest child and with household chores.  (Tr. 79).

McCall testified that she recently had some verbal disagreements with her neighbors.  (Tr. 80-81).  On at least one occasion, she physically assaulted her neighbor during an argument.  (Tr. 82).

Vocational Expert Carol McManus ("McManus") also testified during the hearing.  (Tr. 35, 49, 82-85).  The ALJ first indicated to McManus that he found that McCall had no past relevant work.  (Tr. 49, 83).  The ALJ then asked McManus whether a person would be able to perform any positions in the national economy who was the same age as McCall, had the same education and vocational profile, and could perform the full range of light work, but was limited to simple tasks and occasional interaction with coworkers and the general public. (Tr. 83-84).  McManus responded that such an individual could perform the positions of battery tester and "cleaner housekeeping."  (*Id.*).

The ALJ then asked McManus whether a person would be able to perform any positions in the national economy who was the same age as McCall, had the same education and vocational profile, but who was either off-task or absent for approximately twenty-five percent of the time.  (Tr. 84).  McManus responded that such an individual would be unable to maintain substantial gainful employment.  (Tr. 85).

## DISCUSSION

### I.   Standard of Review

This Court's scope of review is limited to whether the Commissioner's determination is supported by substantial evidence in the record and whether the Commissioner applied the correct legal standards.  *See Butts v. Barnhart*, 388 F.3d 377, 384 (2d Cir. 2004) ("[i]n reviewing a final decision of the Commissioner, a district court must determine whether the correct legal standards were applied and whether substantial evidence supports the decision"), *reh'g granted in part and denied in part*, 416 F.3d 101 (2d Cir. 2005); *see also Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998) ("it is not our function to determine *de novo* whether plaintiff is disabled[;] . . . [r]ather, we must determine whether the Commissioner's conclusions are supported by substantial evidence in the record as a whole or are based on an erroneous legal standard") (internal citation and quotation omitted).  Pursuant to 42 U.S.C. § 405(g), a district court reviewing the Commissioner's determination to deny disability benefits is directed to accept the Commissioner's findings of fact unless they are not supported by "substantial evidence."  *See* 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner . . . as to any fact, if supported by substantial evidence, shall be conclusive").  Substantial evidence is defined as "more than a mere scintilla.  It means such relevant evidence as a reasonable mind

might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (internal quotation omitted).

To determine whether substantial evidence exists in the record, the court must consider the record as a whole, examining the evidence submitted by both sides, "because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Williams ex rel. Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988). To the extent they are supported by substantial evidence, the Commissioner's findings of fact must be sustained "even where substantial evidence may support the claimant's position and despite the fact that the [c]ourt, had it heard the evidence *de novo*, might have found otherwise." *Matejka v. Barnhart*, 386 F. Supp. 2d 198, 204 (W.D.N.Y. 2005) (citing *Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982), *cert. denied*, 459 U.S. 1212 (1983)).

A person is disabled if he or she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A) & 1382c(a)(3)(A). In assessing whether a claimant is disabled, the ALJ must employ a five-step sequential analysis. *See Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982) (*per curiam*). The five steps are:

(1)     whether the claimant is currently engaged in substantial gainful activity;

(2)     if not, whether the claimant has any "severe impairment" that "significantly limits [the claimant's] physical or mental ability to do basic work activities";

(3)     if so, whether any of the claimant's severe impairments meets or equals one of the impairments listed in Appendix 1 of Subpart P of Part 404 of the relevant regulations;

(4)     if not, whether despite the claimant's severe impairments, the claimant retains the residual functional capacity to perform his past work; and

(5)     if not, whether the claimant retains the residual functional capacity to perform any other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520(a)(4)(i)-(v) & 416.920(a)(4)(i)-(v); *Berry v. Schweiker*, 675 F.2d at 467.

"The claimant bears the burden of proving his or her case at steps one through four[;] . . . [a]t step five the burden shifts to the Commissioner to 'show there is other gainful work in the national economy [which] the claimant could perform.'" *Butts v. Barnhart*, 388 F.3d at 383 (quoting *Balsamo v. Chater*, 142 F.3d 75, 80 (2d Cir. 1998)).

A.      **The ALJ's Decision**

In his decision, the ALJ followed the required five-step analysis for evaluating disability claims.  (Tr. 16-32).  Under step one of the process, the ALJ found that McCall had not engaged in substantial gainful activity since April 5, 2012, the application date.  (Tr. 21).  At step two, the ALJ concluded that McCall had the severe impairments of lumbago, obesity, major depressive disorder, intermittent explosive disorder, anxiety, and personality disorder.  (*Id.*).  The ALJ determined that McCall's gastroesophageal reflux disease was not severe.  (Tr. 21-22).  At step three, the ALJ determined that McCall did not have an impairment (or combination of impairments) that met or medically equaled one of the listed impairments.  (Tr. 22-23).  With respect to McCall's mental impairments, the ALJ found that McCall suffered from mild restrictions in activities of daily living and moderate difficulties in maintaining social functioning and concentration, persistence, and pace.  (*Id.*).  The ALJ concluded that McCall had the RFC to perform light work, but was limited to work involving simple tasks and requiring no more than occasional interaction with coworkers and the general public.  (Tr. 23-29).  At steps four and

five, the ALJ determined that McCall had no past relevant work, but that other jobs existed in the

national economy that McCall could perform, including the positions of battery tester and

"cleaner, housekeeping."  (Tr. 29-30).  Accordingly, the ALJ found that McCall was not

disabled.

>      **B.      McCall's Contentions**

McCall contends that the ALJ's determination that she was not disabled is not

supported by substantial evidence and is the product of legal error.  (Docket # 12-1).  First, she

challenges the ALJ's RFC assessment on the grounds that the ALJ failed to give appropriate

weight to the opinions of Reddy and Bush, McCall's treating psychiatrist and therapist,

respectively.  (*Id.* at 17-26).  Next, McCall maintains that the ALJ failed to properly assess her

credibility.  (*Id.* at 27-30).  Finally, she contends that the ALJ's step five determination was

erroneous because the ALJ's hypothetical to the vocational expert relied upon a flawed RFC.

(*Id.* at 26-27).


>  **II.      Analysis**

I turn first to McCall's contention that the ALJ's RFC assessment was flawed.

An individual's RFC is her "maximum remaining ability to do sustained work activities in an

ordinary work setting on a regular and continuing basis."  *Melville v. Apfel,* 198 F.3d 45, 52 (2d

Cir. 1999) (quoting SSR 96–8p, 1996 WL 374184, *2 (July 2, 1996)).  When making an RFC

assessment, the ALJ should consider "a claimant's physical abilities, mental abilities,

symptomology, including pain and other limitations which could interfere with work activities

on a regular and continuing basis."  *Pardee v. Astrue*, 631 F. Supp. 2d 200, 221 (N.D.N.Y. 2009)

(citing 20 C.F.R. § 404.1545(a)).  "To determine RFC, the ALJ must consider all the relevant

evidence, including medical opinions and facts, physical and mental abilities, non-severe

impairments, and [p]laintiff's subjective evidence of symptoms." *Stanton v. Astrue*, 2009 WL

1940539, *9 (N.D.N.Y. 2009) (citing 20 C.F.R. §§ 404.1545(b)-(e)), *aff'd*, 370 F. App'x 231 (2d

Cir. 2010).

McCall argues that the ALJ improperly discounted the opinion provided by Bush

on April 18, 2012, and adopted by Reddy on March 8, 2013 (hereinafter the "March 8, 2013

opinion"). (Docket ## 12-1 at 17-26; 15 at 1-5). She also maintains that the ALJ improperly

discounted the January 7, 2014 opinion provided by Bush and certain limitations assessed by

Lin, the consulting examiner. (Docket # 12-1 at 18, 20-22). "An ALJ who refuses to accord

controlling weight to the medical opinion of a treating physician must consider various 'factors'

to determine how much weight to give to the opinion." *Halloran v. Barnhart*, 362 F.3d 28, 32

(2d Cir. 2004). The ALJ must explicitly consider:

> (1)    the frequency of examination and length, nature, and extent
>        of the treatment relationship,
>
> (2)    the evidence in support of the physician's opinion,
>
> (3)    the consistency of the opinion with the record as a whole,
>
> (4)    whether the opinion is from a specialist, and
>
> (5)    whatever other factors tend to support or contradict the
>        opinion.

*Gunter v. Comm'r of Soc. Sec.*, 361 F. App'x 197, 199 (2d Cir. 2010). The regulations also

direct that the ALJ should "give good reasons in [his] notice of determination or decision for the

weight [he] give[s] [claimant's] treating source's opinion." *Halloran v. Barnhart*, 362 F.3d at 32

(quoting 20 C.F.R. § 404.1527(c)(2)). "Even if the above-listed factors have not established that

the treating physician's opinion should be given controlling weight, it is still entitled to

deference, and should not be disregarded." *Salisbury v. Astrue*, 2008 WL 5110992, *4 (W.D.N.Y. 2008).  The same factors should be used to determine the weight to give to a consultative physician's opinion.  *Tomasello v. Astrue*, 2011 WL 2516505, *3 (W.D.N.Y. 2011). "However, if the treating physician's relationship to the claimant is more favorable in terms of the length, nature and extent of the relationship, then the treating physician's opinion will be given more weight than that of the consultative examining physician."  *Id.*

Licensed clinical social workers are not considered "acceptable medical sources" under the regulations.  20 C.F.R. §§ 404.1513(a), 416.913(a).  Instead, clinical social workers are considered "other sources" within the meaning of 20 C.F.R. §§ 404.1513(d) and 416.913(d).  As such, their opinions "cannot establish the existence of a medically determinable impairment." *See* SSR 06-03P, 2006 WL 2329939, *2 (2006).  Their opinions may be used, however, "to show the severity of the individual's impairment(s) and how it affects the individual's ability to function."  *Id.*

Social Security Ruling 06-03P recognizes that "[m]edical sources . . . , such as . . . licensed clinical social workers, have increasingly assumed a greater percentage of the treatment and evaluation functions previously handled primarily by physicians and psychologists."  *Id.* at *3.  The ruling recognizes that such opinions are "important and should be evaluated on key issues such as impairment severity and functional effects, along with the other relevant evidence in the file."  *Id.*  The ruling directs the ALJ "to use the same factors for the evaluation of the opinions of acceptable medical sources to evaluate the opinions of medical sources who are not acceptable medical sources, including licensed social workers."  *Genovese v. Astrue*, 2012 WL 4960355, *14 (E.D.N.Y. 2012) (internal quotations omitted).  "An ALJ is not required to give controlling weight to a social worker's opinion; although he is not entitled to disregard it

altogether, he may use his discretion to determine the appropriate weight." *Cordero v. Astrue*, 2013 WL 3879727, *3 (S.D.N.Y. 2013); *Jones v. Astrue*, 2012 WL 1605566, *5 (N.D.N.Y.) ("the Second Circuit has held that 'the ALJ has discretion to determine the appropriate weight to accord the [other source's] opinion based on all the evidence before him") (quoting *Diaz v. Shalala*, 59 F.3d 307, 313-14 (2d Cir. 1995)), *report and recommendation adopted*, 2012 WL 1605593 (N.D.N.Y. 2012); *Allen v. Astrue*, 2008 WL 660510, *9 (N.D.N.Y. 2008) (although not an acceptable medical source, "[a]s plaintiff's longtime treating psychotherapist and the only treating source who evaluated the disabling effects of plaintiff's mental impairments, [plaintiff's therapist's] opinion was relevant to the ALJ's disability determination[;] . . . [t]hus, the ALJ should have articulated why he discredited [the therapist's] reports").

### A.  The March 8, 2013 Opinion of Reddy and Bush

The ALJ accorded "little weight" to the March 8, 2013 opinion.  In doing so, he acknowledged that Reddy was McCall's treating psychiatrist and that McCall's psychiatric symptoms limited her ability to perform skilled work and to interact with coworkers and the general public.  (Tr. 26-27).  He nonetheless concluded that the severe limitations identified in the March 8, 2013 opinion were inconsistent with McCall's treatment records, which documented some improvement in overall functioning with treatment.  (Tr. 27).  Further, the ALJ concluded that the "symptom treatment" therapy provided to McCall was inconsistent with a finding that she suffered from severe limitations.  (*Id.*).  Additionally, the ALJ found the assessed limitations inconsistent with McCall's "fairly broad range of activities of daily living." (Tr. 28).  Finally, the ALJ discounted the opinion because the "use of checkboxes [on the form] for the majority of [the] assessment renders [the] opinion less compelling."  (Tr. 27).

Having carefully reviewed the record, the March 8, 2013 opinion, and the ALJ's decision, I conclude that the grounds provided by the ALJ for discounting the opinion do not constitute "good reasons." The ALJ's conclusion that the opinion was inconsistent with the treatment records is undercut by the mischaracterization in the ALJ's opinion of several facts in McCall's treatment record. For instance, in reviewing the March 8, 2013 opinion, the ALJ inaccurately characterized the assessment as suggesting that McCall suffered from "no more than occasional episodes attributable to her psychiatric impairment." (*Id.*). Bush and Reddy, however, opined that McCall had frequently lost jobs or failed to complete education or training programs due to her psychiatric condition. (Tr. 204). They also opined that McCall was able only occasionally to interact appropriately with others, suggesting that most of her interactions with others were inappropriate. (*Id.*). Thus, although Bush and Reddy noted some occasional limitations associated with McCall's mental impairments, they also noted that McCall's condition caused some frequent limitations as well. (*Id.*).

In addition, in reaching the conclusion that McCall's mental status was "stable" or improved with treatment (Tr. 26-27, 29), the ALJ relied upon the absence of any documented instances of impulsive or aggressive behavior postdating the application date. (Tr. 26 ("Although treatment records indicated a history of impulsive and aggressive behavior, reports since the application filing date do not detail any significant outbursts.")). Having reviewed the record, I find that it contains several treating records which suggest that McCall continued to experience difficulties managing her anger, particularly when interacting with others. For instance, a treatment note dated April 10, 2012, approximately five days after the application date, reflects that McCall reported to Reddy that she had "punched a wall yesterday out of anger sustain[in]g some injury to her right hand." (Tr. 371). In a further treatment note dated May 8,

2012, Baxter noted that McCall expressed anger during the visit after being informed that she did not qualify for a handicap tag.  (Tr. 266).

Similarly, treatment notes dated February 6, 2014, appear to corroborate McCall's testimony that she was involved in confrontations with her neighbors, as well as with the staff at EBMHC.  (Tr. 375).  McCall testified that she "went off on" and "cursed out" a member of the staff at EBMHC over a scheduling conflict.  (Tr. 53).  McCall's conflicts with the staff were referenced in Reddy's treatment notes in which he recognized that she complained of being "checked in late by the staff at the front desk."  (Tr. 375).  McCall also testified that she was involved in a violent interaction with her neighbor.  (Tr. 81-82).  Reddy noted McCall's reports of conflicts with her neighbors in his treatment notes.[6]  (Tr. 375).

Moreover, these documented outbursts and the conclusions about McCall's frequent limitations reflected in the March 8, 2013 opinion are consistent with Lin's opinion that McCall was unable to relate adequately with others or appropriately deal with stress, which the ALJ rejected.  This Court is simply unable to evaluate whether and the extent to which the ALJ would have weighed the opinions of record differently in the absence of the noted mischaracterizations.

Even apart from the factual mischaracterizations discussed above, it is not clear that the March 8, 2013 opinion is inconsistent with the treatment records.  The ALJ found that the "substantial restrictions" assessed in that opinion were inconsistent with documentation suggesting that McCall's functioning had improved with treatment.  (Tr. 27).  As McCall herself concedes, treatment helped to alleviate her symptoms and improve her overall functioning; relative improvement alone, however, is not a sufficient basis upon which to discount a medical

---

[6]  Additionally, the treatment notes suggest that McCall was involved in a severe violent episode in September 2011, approximately six months prior to her application for benefits.  (Tr. 373-74).

opinion. *See Williams v. Colvin*, 2016 WL 5468336, *11 (W.D.N.Y. 2016) ("[t]he fact that [the treating physician] suggested, despite plaintiff's temperate improvements, that she was nonetheless severely restricted by her mental impairments and would suffer psychiatric harm working a routine and simple job should speak to the severity of plaintiff's impairments and not to any inconsistency in [the treating physician's] opinion") (citing *Garcia v. Colvin*, 2015 WL 7758533, *10 (S.D.N.Y. 2015) ("evidence of improvement alone, without an assessment of how any such improvement reduced the claimant's functional limitations such that they are no longer, or never were, marked limitations is insufficient[;] . . . [o]ne can show even significant relative improvement – but if the deficiency is sufficiently great, a marked limitation may remain) (citations omitted)).

The record demonstrates that McCall began treatment with Bush in 2006 and with Reddy in 2012. The records of that treatment reflect that although she was "stable" on her medication regimen and her symptoms had improved, she continued to experience "breakthrough" symptoms, including depression, irritability, paranoid ideation, and memory and concentration deficits. (Tr. 248, 342, 347, 351, 355, 359, 363, 367, 371, 381, 384, 387, 390). On the basis of their treatment history with McCall, both Bush and Reddy opined in the March 8, 2013 opinion that while McCall had improved compared to her pre-treatment condition, she continued to be impaired by her symptoms and to suffer from significant limitations. Stated another way, they opined that McCall's symptoms persisted in severity sufficient enough to interfere with her ability to engage in work-related activities on a sustained basis. Thus, the improvement in McCall's symptoms was not necessarily inconsistent with the March 8, 2013 opinion, nor was it necessarily an adequate justification for discounting the opinion. At the very least, before rejecting the March 8, 2013 opinion, the ALJ should have consulted Bush and

Reddy to determine whether they continued to believe that McCall suffered from significant work-related mental health limitations, despite any improvement in her condition, and the basis for that opinion.  *See Bonet v. Astrue*, 2008 WL 4058705, *24 (S.D.N.Y. 2008 ) ("[i]t is unclear whether [the treating physician] was of the view that [p]laintiff's condition had improved and if so, whether it changed his opinion about [p]laintiff's ability to work[;] [i]f he persisted in his opinion that she was unable to work, the ALJ should have provided him an opportunity to explain why he maintained such a position in spite of the improved GAF scores").

I also reject the ALJ's conclusion that the limitations assessed in the March 8, 2013 opinion were necessarily inconsistent with the type of treatment McCall received.  As an initial matter, it is unclear whether the record supports the ALJ's characterization of McCall's treatment as "symptom treatment" (presumably, as distinguished from treatment to address the causes of symptoms).  The record demonstrates that for at least eight years before the ALJ's decision, McCall had received regular therapy, medication management, and treatment reviews to address her ongoing mental health issues.  In addition to periodic medication management sessions with Reddy, McCall attended therapy sessions with Bush once or twice each month, during which McCall evidently discussed her ongoing mental health issues.  Without further explanation from the ALJ, the basis for his conclusion that McCall's treatment was somehow inconsistent with the severity of the limitations assessed in the March 8, 2013 opinion is unclear.[7]

_____

[7] Of course, an ALJ may not rely solely upon the course of treatment to justify discounting the treating physician's opinion.  *See Foxman v. Barnhart*, 157 F. App'x 344, 347 (2d Cir. 2005) ("the ALJ erred in questioning the validity of [the treating physician's] opinion based on his 'conservative' course of treatment") (citing *Shaw v. Chater*, 221 F.3d 126, 134 (2d Cir. 2000) (ruling that "the district court improperly characterized the fact that [the treating physician] recommended only conservative [treatment] as substantial evidence that the plaintiff was not physically disabled during the relevant period")); *Burgess v. Astrue*, 537 F.3d 117, 129 (2d Cir. 2008) ("[n]or is the opinion of the treating physician to be discounted merely because he had recommended a conservative treatment regimen"); *Silvio v. Colvin*, 2016 WL 3369618, *6 (S.D.N.Y. 2016) ("[a]n ALJ may not 'impos[e his lay] notion that the severity of a physical impairment directly correlates with the intrusiveness of the medical treatment

I similarly reject the ALJ's conclusion that the March 8, 2013 opinion was necessarily inconsistent with McCall's activities of daily living.  Although a claimant's "pattern of daily living" is an "important indicator of the intensity and persistence of [the claimant's] symptoms," *see* 20 C.F.R. § 416.929(c)(3), the ALJ failed to explain how McCall's activities were inconsistent with the March 8, 2013 opinion.  The ALJ simply stated without further explanation that limitations assessed in the opinion were "contrary to McCall's fairly broad range of activities of daily living."[8]  (Tr. 28).  The record does not demonstrate, however, that McCall performed her daily activities on a sustained basis or independently.  For instance, McCall indicated that she received assistance from relatives to care for her children, complete her household chores and prepare meals, and that she sometimes was unable to perform these tasks due to depression and stress.  (Tr. 78-79, 183-90).  In any event, the activities identified by the ALJ are not necessarily inconsistent with the March 8, 2013 opinion that McCall would have difficulty performing work-related activities on a consistent and sustained basis.  *See Miller v. Comm'r of Soc. Servs.*, 2015 WL 337488, *22 (S.D.N.Y. 2015) ("[i]n giving 'little weight' to [treating physician's] opinion, the ALJ also reasoned that it was 'inconsistent with the extensive activities of daily living that the claimant was able to perform'[;] . . . [s]uch a conclusory statement, which does not identify which activities are being referenced, is insufficient to meet the ALJ's obligations to 'comprehensively set forth [the] reasons for the weight assigned' to the opinion") (quoting *Burgess v. Astrue*, 537 F.3d at 129).

---

ordered'") (quoting *Shaw v. Chater*, 221 F.3d at 134-35); *Ganoe v. Comm'r of Soc. Sec.*, 2015 WL 9267442, *4 (N.D.N.Y.) ("an ALJ cannot rely on a plaintiff's prescribed conservative treatment as substantial evidence to undermine the treating physician's opinion"), *report and recommendation adopted*, 2015 WL 9274999 (N.D.N.Y. 2015).

[8]  The ALJ's decision does address the inconsistency between McCall's daily activities and her alleged exertional limitations (Tr. 28), but does not discuss how her activities are inconsistent with her alleged mental limitations.

For the reasons discussed above, I conclude that the ALJ's justifications for rejecting the March 8, 2013 opinion do not constitute "good reasons."[9]  *See Halloran*, 362 F.3d at 33 ("[w]e do not hesitate to remand when the Commissioner has not provided 'good reasons' for the weight given to a treating physician[']s opinion and we will continue remanding when we encounter opinions from ALJ's that do not comprehensively set forth reasons for the weight assigned to a treating physician's opinion").

The government maintains that the ALJ properly discounted the March 8, 2013 opinion because it was inconsistent with other medical opinions of record, including Baxter's opinion that McCall was not disabled and Kamin's opinion that she suffered from mild to moderate limitations that did not impede her ability to work.  (Docket # 14-1 at 14-16).  As an initial matter, I disagree that Baxter opined that McCall was not disabled; rather, the treatment notes suggest that Baxter reserved opinion pending a further evaluation.  In any event, the record does not suggest that Baxter provided mental health treatment to McCall; any opinion she could offer therefore would presumably relate to McCall's physical limitations.  Further, the ALJ did not rely on Baxter's "opinion" or Kamin's opinion to justify discounting the March 8, 2013 opinion.  Indeed, the ALJ never discussed Kamin's opinion in his decision and, although the ALJ noted Baxter's opinion, he did so in the context of evaluating her physical impairments.  The government's reliance on these *post hoc* rationales is impermissible.  *See Cestare v. Colvin*, 2016 WL 836082, *4 (W.D.N.Y. 2016) ("[s]uch *post hoc* interpretations of an ALJ's decision are not permitted").

---

[9]  The ALJ also found the opinion "less compelling" because it was conveyed on a checkbox form. Although the form of the opinion and the degree of explanation are factors properly considered by an ALJ in evaluating an opinion, *see Latham v. Colvin*, 2016 WL 6067848, *4 (W.D.N.Y. 2016) ("the Second Circuit has consistently held that opinions rendered on 'check-box' forms are often the ones entitled to little meaningful insight into the basis for the clinician's findings"), an ALJ should not discount a treating physician's opinion "simply because it was expressed in a 'check-the-box' format," *see Goble v. Colvin*, 2016 WL 3179901, *5 (W.D.N.Y. 2016).

### B.      The January 7, 2014 Opinion of Bush

The ALJ also discounted Bush's January 7, 2014 opinion because Bush is not an acceptable medical source.  Again, that factor alone is not an acceptable reason for discounting a treating therapist's opinion.  *See Garcia v. Colvin*, 2015 WL 1280620, *7 (W.D.N.Y. 2015) ("[plaintiff] is correct that the ALJ should not have discounted the opinion of a licensed social worker solely on the grounds that she is not an acceptable medical source under the regulations").

### C.      Lin's Opinion

The ALJ's explanation for rejecting the limitations assessed by Lin relating to McCall's ability to interact with others and to deal with stress limitations, while adopting the remainder of Lin's opinion, was wholly conclusory.  The ALJ reasoned that the limitations were "not internally consistent with the other findings in the examination" and were not "supported by the treatment record and other opinions noted in this decision," although he failed to identify, let alone explain, the internal inconsistencies or the inconsistencies with the record.  (Tr. 26). Although there is no "absolute bar to crediting only portions of medical source opinions[,]" an ALJ who chooses to adopt only portions of a medical opinion must explain his decision to reject the remaining portions.  *See Younes v. Colvin*, 2015 WL 1524417 at *8 (although an ALJ is free to credit only a portion of a medical opinion, "when doing so smacks of 'cherry picking' of evidence supporting a finding while rejecting contrary evidence from the same source, an administrative law judge must have a sound reason for weighting portions of the same-source opinions differently"); *Phelps v. Colvin*, 2014 WL 122189, *4 (W.D.N.Y. 2014) ("[t]he selective adoption of only the least supportive portions of a medical source's statements is not permissible") (internal quotations and brackets omitted); *Caternolo v. Astrue*, 2013 WL

31

1819264, *9 (W.D.N.Y. 2013) ("[i]t is a fundamental tenet of Social Security law that an ALJ cannot pick and choose only parts of a medical opinion that support his determination") (internal quotations omitted) (collecting cases); *Searles v. Astrue*, 2010 WL 2998676, *4 (W.D.N.Y. 2010) ("[a]n ALJ may not credit some of a doctor's findings while ignoring other significant deficits that the doctor identified").

### D.      Remand is Warranted

In sum, the ALJ's failure to articulate good reasons for discounting the March 8, 2013 opinion and Bush's January 7, 2014 opinion, and to explain the basis for rejecting the limitations assessed by Lin, constitutes legal error, and remand is warranted in order for the ALJ to determine the weight, if any, to accord these opinions based upon the relevant factors and the record as a whole. Although the ALJ may still conclude that the opinions are entitled to limited weight, he must provide good reasons supported by substantial evidence for his determination.

On remand, the ALJ should consider re-contacting Bush and requesting her treatment notes. For unexplained reasons, although Reddy's progress notes and Bush's periodic reviews are included in the record, Bush's treatment notes are not. As her primary treating therapist, Bush's treatment notes likely contain substantial relevant information concerning McCall's day-to-day experiences, including whether she experienced additional significant outbursts.

In light of my determination that the ALJ erred in evaluating the medical opinions of record and that remand is appropriate, I decline to reach McCall's challenges to the ALJ's credibility analysis and his step five assessment. *See Norman v. Astrue*, 912 F. Supp. 2d 33, 85 n.79 (S.D.N.Y. 2012) ("[b]ecause I find that remand is proper on the basis of the ALJ's failure to properly develop the record and to properly apply the treating physician rule, I do not reach

plaintiff's arguments with respect to (1) the ALJ's determination of his RFC at step four and (2) whether the ALJ carried his burden at step five of the analysis[;] [t]he aforementioned legal errors cause the remaining portions of the ALJ's analysis to be inherently flawed"); *Balodis v. Leavitt*, 704 F. Supp. 2d 255, 268 n.14 (E.D.N.Y. 2010) ("[b]ecause the [c]ourt concludes that the ALJ erred in applying the treating physician rule, and that a remand is appropriate, the [c]ourt need not decide at this time whether the ALJ erred in assessing plaintiff's credibility").

## CONCLUSION

For the reasons stated above, the Commissioner's motion for judgment on the pleadings (**Docket # 14**) is **DENIED**, and McCall's motion for judgment on the pleadings (**Docket # 12**) is **GRANTED** to the extent that the Commissioner's decision is reversed, and this case is remanded to the Commissioner pursuant to 42 U.S.C. § 405(g), sentence four, for further administrative proceedings consistent with this decision.

**IT IS SO ORDERED.**

*s/Marian W. Payson*
MARIAN W. PAYSON
United States Magistrate Judge

Dated: Rochester, New York
     February 16, 2017